UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MANJEET BHATTAL,

                Petitioner,                Case Number 11-CV-15176
                                                    Honorable Sean F. Cox

MARY BERGHUIS,

                Respondent.
_____/

**OPINION AND ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS,
AND DENYING A CERTIFICATE OF APPEALABILITY**

This matter is before the Court on Petitioner Manjeet Bhattal's petition for a writ of habeas corpus filed under 28 U.S.C. § 2254. Petitioner was convicted after a jury trial in the Oakland Circuit Court of conspiracy to deliver or possess with intent to deliver over 1,000 grams of cocaine. MICH. COMP. LAWS § 750.157a. As a result of this conviction Petitioner was sentenced to 10½-to-30 years in prison. The petition raises three claims: (1) insufficient evidence was presented at trial to sustain Petitioner's conviction; (2) Petitioner's trial was rendered fundamentally unfair by the admission of evidence that he had engaged in marijuana trafficking with one of his co-conspirator's; and (3) the prosecutor committed misconduct by arguing facts not in evidence. The Court finds that Petitioner's claims are without merit. Therefore, the petition will be denied. The Court will also deny Petitioner a certificate of appealability.

**I. Facts and Procedural History**

Petitioner's conviction stems from the seizure of twelve kilograms of cocaine from a vehicle pulled over in Oakland County on March 29, 2007. Petitioner was tried jointly with co-defendants David Trevino, Tonin Prendi, and Andon Filipi. Co-defendant Anthony Gonzalez accepted a plea

bargain prior to the trial.

The evidence at trial indicated that during an ongoing investigation by Federal Immigration Customs Enforcement (ICE) agents, information was received that a shipment of cocaine would be passing through Michigan on its way from Chicago to Toronto.

While on surveillance on March 28, 2007, ICE agents noticed a van registered to a person they were investigating for possible narcotic trafficking, Tonin Prendi, parked next to a Ford Expedition with Illinois license plates at an apartment complex in Waterford. The following day, ICE agents observed Prendi leave the apartment complex in his van, make a stop at a storage facility near his home, and continue to a car wash where he parked. Shortly thereafter, ICE agent Barry Burnette testified that a Ford Expedition, with Illinois plates and two passengers, pulled into the car wash and parked in front of Prendi's van. Agent Burnette testified that he saw something being transferred between the vehicles.

Eventually, the van and the Expedition pulled out of the car wash. Two Troy Police Officers were directed to look for a reason to stop the Expedition, which ICE agents believed was carrying cocaine. The officers performed a speed measurement on the Expedition which indicated that it was traveling 73 mph in an area with a speed limit of 65 mph. The officers executed a traffic stop. The two men in the Expedition where identified as Anthony Gonzalez and Andon Filipi. Neither man had drivers' licenses. The officers indicated they would impound the vehicle, and so they searched the Expedition, finding $13,300 in cash, three cell phones, and thirteen kilograms of cocaine. The cocaine was found in a black leather duffel bag in the back compartment of the Expedition. Gonzalez and Filipi were arrested at the scene.

Gonzalez subsequently pled guilty to conspiracy to deliver over 1000 grams of cocaine and

possession with intent to deliver the same. The plea agreement called for a minimum sentence of 2½ years in prison. Pursuant to the plea agreement, Gonzalez testified at the trial of the other defendants.

Gonzalez testified that he had gone to middle school with Trevino, and that he knew Filipi since high school. Gonzalez also knew Petitioner. He stated that he had a business relationship engaging in drug transactions between Illinois and Michigan with Filipi that dated back to two years prior to his arrest.

Over defense objection, Gonzalez testified regarding large marijuana transactions he was involved in that included Petitioner. One deal involved the purchase of between 150-200 pounds of marijuana from a location in Indiana. Thereafter, Gonzalez and Petitioner took another trip to Indiana to pick up an additional 150-200 pounds of marijuana. After arriving back in Illinois, Filipi met Gonzalez and Petitioner and followed them to an unknown location where the marijuana was stored.      Gonzalez testified that David Ruiz was friends with Petitioner and Filipi, and Ruiz was the individual supplying cocaine. Gonzalez met with Ruiz in Filipi's presence twice prior to Trevino's arrest. At one of the meetings, Petitioner was also present, and Petitioner appeared to know Ruiz. The prosecutor submitted phone records purporting to show that Petitioner was the first member of the conspiracy to make telephone contact with Ruiz, in February of 2007.

On the night of March 23, 2007, Trevino was arrested for domestic assault. Gonzalez testified that night Trevino called Filipi and told him that Trevino's girlfriend had called the police. Hearing this news, Gonzalez drove around with Petitioner because Gonzalez was worried about getting in trouble if Trevino decided to talk to the police. In light of Trevino's arrset, on March 24, 2007, Filipi called Petitioner and told him, "it . . . has to be moved." Petitioner then directed

Gonzalez to drive them to the location where Petitioner and Filipi shared an office. Once inside the office building, Petitioner stood on the top of a desk and removed some ceiling tiles. He then directed Gonzalez to remove two laptop computer bags from inside the ceiling.

Gonzalez testified that he did not ask Petitioner why Petitioner did not get the bags himself because Gonzalez was "just playing my position." Gonzalez placed the bags in the trunk of a vehicle on the premises. Gonzalez did not know what was inside the bags. Gonzalez opined that the computer bags were not big enough to fit ten pounds of marijuana but the bags weighed more than ten pounds each. After leaving the office, Gonzalez and Petitioner picked up Ruiz at an apartment complex near where Trevino had been staying.

The morning of March 26, 2007, Gonzalez met Filipi at his apartment parking lot. Petitioner and Filipi pulled up to the apartment complex in a gray Ford Expedition. The prosecutor introduced evidence that the Expedition was rented at O'Hare airport by Petitioner. Credit card records showed that Filipi drove to Michigan on March 27, 2007. The testimony of a cell phone salesman indicated that Filipi, Prendi, and Petitioner were all in Michigan with the Expedition sometime during the day of March 28, 2007. By the evening of March 28, 2007, however, Petitioner and Filipi returned to Chicago and are seen there by the woman who was going to babysit for Filipi's child.  That same evening Filipi enlisted Gonzalez to drive with him back to Michigan the following day.

Gonzalez testified that on March 29, 2007, he and Filipi drove from Chicago to Michigan in the Expedition to a car wash where Prendi was waiting in a green minivan. Filipi retrieved a bag from the minivan and put it in the back of the Expedition. Thereafter, Gonzalez drove the Expedition and Filipi drove with Prendi in the minivan for a short period of time until he jumped back into the Expedition. Days prior to the Michigan trip, Filipi told Gonzalez that they were going to Michigan

to take care of the cocaine. The cocaine was supposed to be going by truck to Canada.

After Filipi and Gonzalez were pulled over by police in the Expedition, calls were made between phones in the vehicle and Petitioner's phone. That evening, a call was made between Petitioner's phone and Ruiz's phone. A half-hour after that, Petitioner reported to the rental car agency that the vehicle had been stolen.

Despite all this testimony regarding his own role and the role of the other defendants in the conspiracy, Gonzalez testified that as far as he knew, Petitioner was not involved in the purchase or sale of cocaine. Gonzalez stated that he only had a marijuana business with Petitioner.

Chicago Police Officer Karen Belluomini testified that on March 29, 2007, she received a phone call from employees of the Hertz rental car office to take a report of an auto theft. Petitioner had reported to Hertz that his rental car, a Ford Expedition, had been taken by his business partner and not returned. Petitioner told the police that his business partner and another individual had dropped Petitioner off at the airport around 11:00 p.m. on March 28, 2007, but they failed to return to pick him up. Petitioner eventually identified Filipi and Gonzalez as the two men who not returned the rental vehicle.

Real estate broker Paul Barclay testified that he managed commercial property in Addison, Illinois. One unit was rented by Petitioner and Filipi.

Christen Duff, Gonzalez's girlfriend, testified that she met Filipi, Petitioner, and Trevino through Gonzalez and saw them together frequently. A few days after Filipi's arrest, Petitioner met with Duff to see how she was doing and to pay her for babysitting Filipi's child.

Cook County Sheriffs canine officer Daniel Strong testified that in May 2007, he took his canine into the office rented by Filipi and Petitioner. The dog alerted for the presence of narcotics

on a black suitcase in the first room of the suite. In the second room, the dog alerted to the presence of narcotics in the ceiling. In the east room of the suite, the dog alerted on a desk.

Another police officer contacted Petitioner's mother, and she allowed him to search her house where Petitioner resided. In Petitioner's bedroom, police recovered a one-way plane ticket from Chicago to Detroit on March 28, 2007, and an itinerary for that flight, in an envelope addressed to Filipi. The flight left Chicago on the 28th at 11:00 a.m.

A Michigan State Police technician testified that one of the latent prints found on the duffel bag containing the cocaine belonged to Trevino.

Detective James Monk testified regarding phone calls and text messages made and received by the phones found in the Explorer. The evidence showed that multiple "walkie-talkie" calls were made between Petitioner's phone and Filipi's phone between March 28th and 29th.

Ammar Yousif testified he was employed at phone shop in Waterford, Michigan. On March 27, 2007, Filipi and Prendi came into his shop and they purchased two cell phones on the family plan. The next day, March 28, 2007, Prendi and Filipi returned to the store with Petitioner and Petitioner also purchased a cell phone. Yousif saw Petitioner get out of a Ford Expedition and Filipi and Prendi got out of a two-door car. Two weeks later, Prendi came back into the store with a younger gentleman and said he wanted to cancel the account.

Based on this evidence, the jury acquitted Prendi, but found Petitioner guilty of conspiracy to possess with intent to deliver over 1000 grams of cocaine and not guilty of possession with intent to deliver over 1000 grams of cocaine. Filipi and Trevino were also convicted of narcotics offenses.

Following sentencing, Petitioner filed an appeal of right. His appellate brief raising what now form Petitioner's habeas claims. The Michigan Court of Appeals affirmed Petitioner's

convictions in an unpublished Opinion. *People v. Bhattal*, No. 290739, 2011 WL 17516 (Mich. Ct. App. January 4, 2011). Petitioner appealed this decision, but the Michigan Supreme Court denied leave to appeal in a standard form order. *People v. Bhattal*, 8800 N.W.2d 587 (Mich. 2011) (table).

## II. Standard of Review

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pursuant to the AEDPA, Petitioner is entitled to a writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits-

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for

evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 130 S.Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010)((*quoting Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011)(*citing Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (*citing Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or...could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* "[I]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 131 S. Ct. at 786.

Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. *Id.* Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (*citing Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979))(Stevens, J., concurring in judgment)). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in

-8-

justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*, at 786-787.

### III. Analysis

### A. Sufficiency of the Evidence

Petitioner claims that the evidence was insufficient to sustain his conviction. Petitioner asserts that all the evidence really showed was that he knew and associated with drug-dealers, but there was no evidence presented to show that he was part of the conspiracy. Petitioner argues there was no direct evidence tying Petitioner to the conspiracy, and that the circumstantial evidence was far too weak. The Petitioner points out that even the prosecution's main witness, Gonzalez, stated that he did not know whether Petitioner was part of the conspiracy.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Review of a challenge to the sufficiency of evidence must focus on whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The Supreme Court recently characterized this standard as requiring a defendant to show that the jury's verdict "was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012).

Under AEDPA review, the standard becomes even more difficult to meet. This is because "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id*. This "twice

deferential" standard does not permit a habeas court to engage in a fine-grained factual parsing. *Coleman*, 132 S. Ct. at 2064; *Parker v. Matthews*, 132 S. Ct. 2148 (2012).

Under Michigan law, to establish the elements of conspiracy to possess with intent to deliver cocaine, the prosecution must "prove that (1) the defendant possessed the specific intent to deliver the statutory minimum as charged, (2) his coconspirator possessed the specific intent to deliver the statutory minimum as charged, and (3) the defendant and his coconspirator possessed the specific intent to combine to deliver the statutory minimum as charged to a third person." *People v. Hunter*, 466 Mich. 1, 6-7 (2002). "Direct proof of the conspiracy is not essential; instead, proof may be derived from the circumstances, acts, and conduct of the parties. Inferences may be made because such evidence sheds light on the coconspirators' intentions." *People v. Justice*, 454 Mich. 334, 349 (1997).

The Michigan Court of Appeals rejected the claim on the merits as follows:

> Contrary to defendant's position, our review of the record reveals that the evidence was sufficient to support defendant's conviction. Hours after coconspirator David Trevino was arrested on March 23, 2007, coconspirator Andon Filipi told defendant, "'That' has to be moved." In response to this, defendant took coconspirator Anthony Gonzalez to the taxi office, which was used by both defendant and Filipi and previously unknown to Gonzalez, and moved two heavy bags, which were hidden in the ceiling, to the trunk of a taxicab that defendant had backed up to the building. Testimony revealed that the bags were too heavy for their size to be holding marijuana. Three days later, defendant rented a Ford SUV. Filipi and Gonzalez were driving this Ford SUV they were arrested for the cocaine in Michigan. Coconspirator Trevino's fingerprint was found on one of the packages of cocaine seized in Michigan. Defendant made a number of phone calls to both Filipi and Gonzalez around the same time that the officer stopped the Ford SUV. And, several hours later, around 7 p.m., defendant spoke with David Ruiz, who was Filipi's cocaine supplier. Half an hour later, defendant reported the Ford SUV stolen by his business partner, whose name he allegedly could not recall.
> The juxtaposition of these facts creates an inference that the black bags contained cocaine, which was the same cocaine seized in Michigan, and that defendant had worked in concert with his coconspirators to achieve the concealment and delivery of the cocaine. Given that one of Trevino's fingerprints was recovered

> from one of the brick's of cocaine, a jury could reasonably infer that the bags in question contained the same 12 kilograms of cocaine that were later seized in Michigan. Further, the fact that defendant knew what Filipi was referencing when Filipi stated, "That has to be moved," demonstrates that defendant knew where the cocaine was concealed and tends to show that Filipi and defendant, knowing that Trevino had knowledge that the black bags contained cocaine, feared that Trevino might tell police about the bags' whereabouts. Further, once defendant found out that police had apprehended Filipi and Gonzalez and he had spoken to Filipi's cocaine dealer, defendant made attempts conceal his involvement in the matter by lying to the police that his rental car had been stolen. "A jury may infer consciousness of guilt from evidence of lying or deception." *People v. Unger*, 278 Mich. App. 210, 227 (2008). Thus, when the evidence, as a whole, is viewed in a light most favorable to the prosecution, combining defendant's intimate knowledge of and involvement with the hidden bags, his active involvement with procuring the car used to transport the cocaine, his repeated contact with Filipi on the day of the cocaine arrest, his deceptive behavior with the police, and his contact with the cocaine supplier just prior to reporting the rented SUV stolen, a jury could reasonably have concluded that defendant was part of a conspiracy to deliver and/or possess with intent to deliver 12 kilograms of cocaine in Michigan. Accordingly, defendant's claim fails. Because defendant's sufficiency of evidence argument fails, his argument that his guilty verdict is against the great weight of the evidence similarly fails.

*People v. Bhattal*, supra.

It is true that there was no direct evidence tying Petitioner to the conspiracy. There was no confidential informant who heard Petitioner make statements about being part of the cocaine transaction, nor was there any physical evidence, such as his fingerprints, tying Petitioner to the cocaine discovered in his rental car. But contrary to Petitioner's argument, it does not follow that the circumstantial evidence only showed that Petitioner associated with drug-dealers. In the context of criminal conspiracy, an agreement does not need to be formal or express. *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir. 1990). In fact, "[t]he evidence that the defendant agreed to join a conspiracy to violate the drug laws 'need only be slight.'" *United States v. Allen*, 619 F.3d 518, 522 (6th Cir. 2010) (quoting *United States v. Hodges*, 935 F.2d 766, 773 (6th Cir. 1991)). "Once the existence of the conspiracy is proven, only slight evidence is necessary to connect a defendant with

the conspiracy." *United States v. Hitow*, 889 F.2d 1573, 1577 (6th Cir. 1989).

Petitioner's conduct around the time of the transportation of the cocaine allowed the jury to draw an inference that he was part of the conspiracy. First and foremost, Petitioner is the one who rented the vehicle used to deliver the cocaine, and he gave it to Gonzalez and Filipi to use. Petitioner asserts there could be an innocent explanation, but it becomes harder to accept when it is combined with the facts that: (1) Petitioner was also in telephone contact with his co-conspirators near the time of their arrest; (2) Petitioner took a one-way flight to Michigan (despite the fact he had rented a vehicle) and was present with co-conspirators in Michigan the day before the arrests; (3) Petitioner also happened to call the supplier of the cocaine, Ruiz, soon after the cocaine was seized, and (4) Petitioner falsely reported the rental vehicle stolen only after he learned of the arrests. That is, Petitioner was in close contact both in person and by telephone with the other conspirators at times and in ways that allowed for the jury to infer that he was part of the conspiracy.

And then there is the fact that Petitioner directed Gonzalez to remove the bags from his ceiling after Trevino was arrested. Petitioner makes much of the fact that it was not conclusively proven that the bags contained cocaine. But again, when the circumstances surrounding this event are considered, it allowed for the jury to make the inference that the bags contained the cocaine. They were removed from their hiding place soon after Trevino was arrested. The arrest prompted Filipi to warn Petitioner that the bags had to be moved. Gonzalez expressed concern that Trevino would say something to police that would get him in trouble. And sure enough, Trevino's fingerprints were found on the bags of cocaine seized from Petitioner's rental vehicle. While it is possible to infer from this conduct that Petitioner was just some oblivious soul helping out his friend, the jury was not required to make such a naive inference. Indeed, to now interpret the circumstantial

-12-

evidence as Petitioner desires is a far cry from viewing the evidence in the light most favorable to the prosecution. More to the point, the inference from the circumstantial evidence that Petitioner was part of the conspiracy survives the standard of "bare rationality" set forth in *Coleman*, supra.

On habeas review of a sufficiency of the evidence claim "[a] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *McDaniel v. Brown*, 558 U.S. 120, 133 (2010), (quoting *Jackson*, 443 U.S. at 326). According the state court's findings of fact a presumption of correctness, this Court concludes that the Michigan Court of Appeals' decision that sufficient evidence was presented for a finding of guilty of conspiracy to deliver cocaine exceeding 1000 grams did not "result[] in a decision that . . . involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Petitioner is not entitled to federal habeas corpus relief with respect to this claim.

**B. Prior Bad Acts Evidence**

Petitioner next claims that the trial court erred in allowing evidence that he participated in the marijuana transactions with Gonzalez. He asserts that the trial court had conditioned the admissibility of this evidence on the prosecutor connecting it with the cocaine conspiracy, but no such connection was every made. As a result, Petitioner contends that the evidence of the prior wrongdoing only served to unfairly suggest to the jury that Petitioner was a criminal and had a propensity to commit narcotics offenses. Even if this is true, however, the claim cannot provide a basis for granting habeas relief.

"State-court evidentiary rulings cannot rise to the level of due process violations unless they

'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996). The Supreme Court has declined to hold that the admission of "other acts" evidence is so extremely unfair that it violates fundamental conceptions of justice. See *Dowling v. United States*, 493 U.S. 342, 352-53 (1990). The Supreme Court has addressed whether other acts testimony is permissible under the Federal Rules of Evidence, see *Huddleston v. United States*, 485 U.S. 681 (1988), but it has not addressed the issue in constitutional terms. Such matters are more appropriately addressed in codes of evidence and procedure than under the Due Process Clause. *Dowling*, 493 U.S. at 352. "There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Consequently, there is no "clearly established federal law" to which the state court's decision to allow this evidence could be "contrary" within the meaning of section 2254(d)(1). *Id*. at 513. Therefore, the Court must deny relief on this claim.

**C. Prosecutorial Misconduct**

Petitioner finally argues that the prosecutor committed misconduct by arguing facts not in evidence. Specifically, Petitioner primarily asserts that the prosecutor unfairly referred to the bags removed from the office ceiling as containing cocaine during opening statement, cross examination of Gonzalez, and in closing argument, when there was no real evidence supporting that assertion. Petitioner also generally complains that the prosecutor exaggerated other facts and notes that at one point the trial court warned her to be careful.

The "clearly established Federal law" relevant to a habeas court's review of a prosecutorial

misconduct claim is the Supreme Court's decision in *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). *Parker v. Matthews*,   U.S.   , 132 S. Ct. 2148, 2153 (June 11, 2012). In *Darden*, the Supreme Court held that a "prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). This Court must ask whether the Michigan Court of Appeals' (which, despite finding the claims not properly preserved, nevertheless, denied them on the merits) decision denying Petitioner's prosecutorial misconduct claims "'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Parker*,   U.S. at   , 132 S. Ct. at 2155, (quoting *Harrington*, 562 U.S. at   , 131 S. Ct. at 786-87.

"[P]rosecutors can argue the record, highlight the inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence." *Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005). The prosecutor's argument did just that. The prosecutor did characterize the bags removed from the ceiling as containing the cocaine, but those comments were made in the context of an argument that the circumstances of the bags' removal allowed for an inference that they contained the cocaine. The prosecutor was not required to remind the jury each time she referred to the bags as containing cocaine that the statement was based on an inference. The comments were not improper. Thus, this Court finds that the state court's decision that no prosecutorial misconduct occurred was not "so far out of line with the very general standard" established in *Darden* as to entitle Petitioner to habeas relief. *Davis v. Lafler*, 658 F.3d 525, 535 (6th Cir. 2011) (en banc).

## IV. Certificate of Appealability

Before Petitioner may appeal this decision, a certificate of appealability must issue. See 28 U.S.C. § 2253(c)(1)(a); FED. R. APP. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court denies a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, a court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the claims. *Id*. at 336-37. The Court concludes that a certificate of appealability is not warranted in this case because reasonable jurists could not debate the Court's assessment of Petitioner's claims.

## V. Conclusion

For the foregoing reasons, **IT IS ORDERED** that the petition for a writ of habeas corpus is **DENIED** and the matter is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: July 29, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 29, 2013, by electronic and/or ordinary mail.

S/Jennifer McCoy
Case Manager

-16-